IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 21, 2005

**STATE OF TENNESSEE v. LARRY DALE DRIVER**

**Appeal from the Circuit Court for Robertson County**
**No. 04-0025     Michael R. Jones, Judge**

---

**No. M2004-02569-CCA-R3-CD - Filed August 25, 2005**

---

The Robertson County Circuit Court convicted the defendant, Larry Dale Driver, of assault, a Class A misdemeanor, following a bench trial. The trial court imposed a sentence of eleven months, twenty-nine days, with probation following 180 days in jail. On appeal, the defendant contends that the evidence was insufficient to support his conviction and that the trial court erred by denying him judicial diversion. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and J.C. MCLIN, J., joined.

Roger Eric Nell, District Public Defender, for the appellant, Larry Dale Driver.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and B. Dent Morriss, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's assaulting Anna Driver, his wife at the time, by placing a rope around her neck and wrist and dragging her through the living room of their house. The victim reported the incident to the police the next day, and they arrested the defendant and charged him with aggravated assault.

At trial, Joyce Stark testified that on June 4, 2003, she was working at the Best Western motel where the victim and Virginia Wilson also worked. She said that when their shifts ended, they went to a Mexican restaurant on Memorial Boulevard to eat, relax, and talk. She said a man named "Pops" Heatherly and another girl joined them. She said she ordered tea, Pops ordered a soft drink, and the others ordered alcoholic drinks. She said that while they were chatting, she looked out the window and saw the defendant arrive in his truck. She said that she and the victim were at

Applebee's on one occasion when the defendant showed up and that he "made a real big scene." She said she and Ms. Wilson immediately paid their checks and left to avoid becoming involved in another. She said that several days later, she saw what appeared to be fingerprint marks on the victim's neck.

On cross-examination, Ms. Stark said that she was only at the restaurant long enough to order one beverage before the defendant arrived and that she did not know how long the victim stayed afterward or how much she drank. She said the victim arrived at the restaurant with Pops Heatherly, the father of Raymond Heatherly. She said that Raymond and Pops drove the victim to work as well as other places and that, according to the victim, the two men were just friends of hers.

Virginia Wilson testified that she rode to the Mexican restaurant with Ms. Stark and that she saw the defendant arrive. She said that the defendant appeared to be angry when he entered the restaurant and that Ms. Stark wanted to leave as soon as she saw him.

Raymond Heatherly testified that he knew the defendant and the victim. He said that his father drove the victim to their house after the incident at the restaurant and that when he arrived home from work at approximately 4:30 p.m., she was still there, frightened and confused about what to do. He said that at 6:00 or 6:30 p.m. that evening, the defendant came to their house and asked the victim if she was coming home or staying there. He said the defendant appeared irritated. He said that the victim left with the defendant and that he saw the defendant push her when she was getting into the truck. He said the defendant "had his hand all up in her face" and that he could tell "they was into it pretty bad." He said that he could not tell if the victim had been drinking and that she did not drink any alcohol while at his house. He said that when he drove her to work the next morning, he saw the marks on her neck and wrists where the victim claimed the defendant had tied her with a rope. He said she was very emotional, upset, and frightened. He said that he and the victim had been friends for four years and that he and his father helped her because she had no way to get to work and would frequently be put out of the house with nowhere to go. He said her marriage was not a happy one.

Robertson County Sheriff's Department Deputy Randy Scott testified that on June 5, 2003, the victim reported that the defendant assaulted her using a rope. He said she was a little upset and "teary-eyed" during their conversation. He said he saw red burn marks on her wrist and neck, possibly from a rope. He said that he took photographs and that a female employee also took a photograph of what appeared to be a carpet burn on the victim's back. He said the file was later misplaced, along with the photographs. He said that at that time, the victim did not want the defendant to be charged with a crime but that he filed for an arrest warrant charging the defendant with aggravated assault.

On cross-examination, Deputy Scott testified that the victim told him the assault occurred at 4:00 p.m. and that she and the defendant had been married seven years. He acknowledged that when he arrested the defendant and spoke with some members of the defendant's family, none of them had witnessed the incident involving the rope.

-2-

The victim testified that she was married to the defendant for more than one year but that they had been together seven years. She said that on June 4, 2003, she and some friends decided to go to the Mexican restaurant after they finished work at the Best Western at approximately 1:30 p.m. She said Pops Heatherly gave her a ride to the restaurant. She said she had just ordered some food and a beer when she saw the defendant arrive in his truck, tires squealing. She said he appeared angry when he walked to their table and asked her what she was doing. She said he told her he had followed her from work and then "went off in front of everybody." She said that the restaurant employees called the police and that the defendant threatened to close the place down. She said that the defendant told her that he was going to "take care of" her, which frightened her because she knew what he meant. She said that she and her friends left the restaurant without eating and that she went to Pops Heatherly's house because she was too scared to go home. She said the defendant had tied her up with a rope on previous occasions.

The victim testified that the defendant came to the Heatherlys' house and that she saw him talking to Raymond in the front yard. She said that she went outside and that the defendant instructed her to get into the truck because she was his wife. She said he shoved her into the truck, started arguing with her, and told her she "done had it now." She said that when they arrived home at approximately 5:30 p.m., he retrieved a rope from his fishing boat and tied it around her neck and left wrist. She said that she fought, pulled, scratched, and kicked but that the more she did, the tighter he pulled the rope. She said that he dragged her across the living room floor and that it was painful. She denied that she threatened him with a knife during the incident and identified the rope shown to her at trial as the rope the defendant used to tie her neck and wrist. She said that the defendant had left the rope lying on the living room floor and that she delivered it to the District Attorney's Office.

The victim said she and the defendant did not have a good relationship because he was a very suspicious person. She said that he did not allow her to go anywhere or do anything and that he would take her clothes with him to work so that she had nothing to wear. She said that they both drank alcohol but claimed that they did not "overdo" it. She admitted having a drinking problem in the past but said she could not drink anymore due to health problems. She said she had high blood pressure and was on medication because she recently had a mini-stroke. She said she and the defendant were no longer married.

On cross-examination, the victim said that she and the defendant were alone in the house together when the assault occurred and that his three children were at church. She said that the children came home at 8:30 or 9:00 p.m. and that she and the defendant were still arguing. She said that shortly after the incident, she was served with divorce papers and acknowledged that she was unaware he had filed for divorce.

Robert Driver testified that he was the defendant's father and that he was at his son's house for a little while on the evening of June 4, 2003, but was uncertain of the exact time. He said the defendant had his hands up against the victim trying to keep her away from him. He said that the victim was trying to scratch the defendant but that he did not notice any marks on either of them.

He said that the victim was so drunk she was unable to stand and that this was her condition nearly every time he saw her. He said that as far as he knew, the defendant did not drink alcohol. He identified the rope as the defendant's and said he usually kept it in the back of his truck.

The defendant testified that on June 4, 2003, he quit working at 4:30 or 5:00 p.m. and went home. He said that the victim was not home. He said that she worked at Best Western but that he had no idea what time she got off work because she usually did not come straight home afterward. He said he drove to Springfield and when he arrived at the Mexican restaurant, he asked her what gave her the right to go drinking when she did not want him to go drinking. He said he left the restaurant immediately thereafter and did not threaten her or do anything else to warrant anyone calling the police. He denied that he drove to the Heatherlys' house to pick up the victim, claiming that she came home of her own accord. He said that when she entered the house, she walked into the kitchen, grabbed a knife from the kitchen drawer, and tried to stab him. He said that he grabbed her wrist to protect himself but that she continued trying to stab him until approximately 9:00 p.m. He said that the children returned home from church at 8:00 or 8:30 p.m. and that the victim was still trying to claw and scratch him. He denied that he tied her up with a rope. He said that she was "tee-totally" drunk and that he went to bed and locked the bedroom door. He said that she kept banging on the door, wanting to come in and go to bed with him. He said he finally let her in and then they both went to sleep.

The defendant said that he was not questioned by any officers when they arrested him or during his subsequent detention. He said he was never given a chance to tell his side of the story. He said that he had filed for divorce before he was jailed and that he believed the victim was served with the divorce papers on the day she came home drunk and tried to stab him.

On cross-examination, the defendant testified that he rarely drinks alcoholic beverages, having maybe one drink every two or three months, and that drinking alcohol was an issue in his marriage to the victim because she liked drinking "four at a time." With regard to his prior statement that the victim was served with divorce papers on June 4, the prosecutor showed the defendant a copy of the summons which indicated the papers were served on June 9. He responded that the summons served beforehand was a different one, but the prosecutor pointed out that the divorce papers were filed on June 5. The defendant replied that he had filed for divorce previously but that he did not know what happened to those papers. He said that the marriage was good until the victim began running around with other men, like Raymond Heatherly. He denied that he went to Springfield to see if the victim was with Heatherly, claiming that he only wanted to pick up some things in town. He admitted that he went to the Mexican restaurant but denied that he followed the victim from work or that he was angry at that time. He said that he stopped at the Mexican restaurant because the truck belonging to the man who gave the victim rides to work was parked there and that he wanted to ask the victim if she was planning to come home that night. He said that when the victim finally came home, she began fussing and fighting and tried to stab him because she was angry about some pictures taken of him with girls from Hooters Restaurant.

The trial court found that no evidence of serious bodily injury was presented at trial. Finding Mr. Heatherly's testimony to be credible, the trial court believed that the defendant was at the Heatherlys' house, contrary to the defendant's statement. It noted that Deputy Scott had observed red marks on the victim's wrist and neck and that the defendant provided no explanation for these marks. The trial court found that the victim's testimony was "all over the page" and that the defendant's testimony was not credible "at all." It noted that the defendant claimed he did nothing wrong and refused to answer various questions during the trial, seemingly without a good reason. The trial court determined that the defendant was guilty of the lesser crime of assault and ordered that a presentence report be prepared for sentencing.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to sustain his conviction for assault. He argues that the trial judge convicted the defendant because he believed neither the victim nor the defendant, which essentially constitutes a "tie," and that a tie must go to the runner in a criminal trial, as it does in baseball. The state contends that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). "In a case tried without a jury, the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict." State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978). Thus, we do not reweigh the evidence but presume that the trial judge has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

In order to convict the defendant for assault, the state had to prove beyond a reasonable doubt that the defendant intentionally, knowingly, or recklessly caused bodily injury to another. T.C.A. § 39-13-101(a)(1). The victim testified that the defendant tied a rope around her left wrist and neck, then dragged her across the living room floor. Deputy Scott testified that he observed red burn marks on the victim's wrist and neck, possibly from a rope and that she also had what appeared to be a carpet burn on her back. Mr. Heatherly testified that he saw marks on the victim's neck and wrists where she told him the defendant had tied her with a rope. The trial court found the testimony of Mr. Heatherly to be credible and found the testimony of the defendant not to be credible "at all." The defendant asserts that because the trial court believed neither the defendant nor the victim, he should be given the benefit of the doubt. However, the trial court did not state that the victim's testimony was not credible but, rather, that it was "all over the page." The trial court followed this remark by stating that neither party knew how to answer a question. The record reflects that the attorneys for the defendant and the state had some difficulty eliciting direct answers to their questions from both the defendant and the victim. We believe the trial court was referring to this difficulty and not the lack of credibility when it made the remark concerning the victim's testimony.

We conclude that the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant committed assault.

## II. JUDICIAL DIVERSION

The defendant also contends that the trial court erred by denying his request for judicial diversion. He contends that the trial court abused its discretion by basing its sentencing determination on what might have happened, rather than on what did happen, referring to the trial court's comment that serious bodily injury or death could have resulted from the defendant's actions. The state contends that the trial court did not abuse its discretion and properly denied the defendant's request. We agree with the state.

A defendant is eligible for judicial diversion if he or she is convicted of a Class C, D, or E felony or lesser crime and has not previously been convicted of a felony or a Class A misdemeanor. See T.C.A. § 40-35-313(a)(1)(B)(I). Judicial diversion allows the trial court to defer further proceedings without entering a judgment of guilt and to place the defendant on probation under reasonable conditions. T.C.A. § 40-35-313(a)(1)(A). When the probationary period expires, if the defendant has completed probation successfully, the trial court will dismiss the proceedings against the defendant with no adjudication of guilt. See T.C.A. § 40-35-313(a)(2). The defendant may then apply to have all records of the proceedings expunged from official records. See T.C.A. § 40-35-313(b). A person granted judicial diversion is not convicted of an offense because a judgment of guilt is never entered. See T.C.A. § 40-35-313(a)(1)(A).

Judicial diversion is not a sentencing alternative for a defendant convicted of an offense. See T.C.A. § 40-35-104(c). Therefore, there is no presumption that a defendant is a favorable candidate for judicial diversion. See State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995). When a defendant challenges the manner of serving a sentence, this court conducts a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). However, when the accused challenges the trial court's denial of a request for judicial diversion, a different standard of appellate review applies. Because the decision to grant judicial diversion lies within the sound discretion of the trial court, this court will not disturb that decision on appeal absent an abuse of discretion. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Upon review, we will give the trial court the benefit of its discretion if "'any substantial evidence to support the refusal' exists in the record." State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (quoting State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983)).

In determining whether to grant judicial diversion, the trial court must consider (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the ends of justice. Electroplating, Inc., 990 S.W.2d at 229; State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In addition, "the record must reflect that the court has weighed all of the factors

in reaching its determination." <u>Electroplating, Inc.</u>, 990 S.W.2d at 229. If the trial court refused to grant judicial diversion, it should state in the record "the specific reasons for its determinations." <u>Parker</u>, 932 S.W.2d at 958-59.

At the sentencing hearing, the presentence report was entered into evidence without objection and no other proof was presented. The defendant's prior criminal record contained one misdemeanor conviction for reckless driving. The defendant requested that the trial court grant judicial diversion. The trial court noted that the crime was extremely serious, as described by the victim, and that serious bodily injury or death could have occurred. In determining that diversion was not appropriate in this case, the trial court noted that it would not serve the interests of justice and that the offense appeared to be a continuing course of conduct for the defendant. The trial court noted the defendant's criminal history had no influence on its decision but found that the nature of the conduct was "very, very serious." The trial court considered the defendant's amenability to correction to weigh in favor of granting diversion, but found this factor was outweighed to a significant degree by the circumstances of the crime and the deterrence value of a harsher sentence. Lastly, the trial court found the defendant's social history as well as the state of his physical and mental health were unexceptional. The trial court then sentenced the defendant to eleven months, twenty-nine days of probation, following 180 days in jail.

The record reflects that in considering the defendant's request for judicial diversion, the trial court did not base its decision on what might have occurred, as the defendant claims, but took into account the circumstances of the offense, the defendant's criminal record, his physical and mental health, and social history. The trial court found the defendant's amenability to correction weighed in favor of diversion but was outweighed by other factors, including the need for deterrence. The trial court determined that diversion was not appropriate and would not serve the ends of justice. Because the trial court properly considered all of the factors and the record supports its denial of judicial diversion, we conclude that the trial court did not abuse its discretion. The defendant is not entitled to relief on this issue.

Based on the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, JUDGE